(Slip Opinion) OCTOBER TERM, 2025 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HAVANA DOCKS CORP. *v.* ROYAL CARIBBEAN CRUISES, LTD., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 24–983. Argued February 23, 2026—Decided May 21, 2026

In 1928, the United States-based Havana Docks Corporation acquired from the Cuban Government a property interest in the development and operation of docks at the Port of Havana. That property interest, a usufructuary concession, was time-limited and set to expire in 2004. The Cuban Government agreed that, if it expropriated the docks before 2004, it would compensate Havana Docks for the value of the works it had constructed. After Fidel Castro seized power in 1959, the new Cuban Government decreed that it would forcibly take American-owned properties and enterprises in Cuba and specifically identified Havana Docks. As relevant here, the Cuban Government seized, without compensation, the docks that Havana Docks had constructed and its property interest in those docks. Havana Docks filed a claim with the Foreign Claims Settlement Commission, which certified about $9 million in losses, plus six percent annual interest. Despite these certified losses, Havana Docks lacked any means to obtain compensation. That began to change in 1996, when Congress enacted the Cuban Liberty and Democratic Solidarity Act, 22 U. S. C. §6021 *et seq.*, which creates a private right of action for United States nationals who own claims to "property which was confiscated by the Cuban Government on or after January 1, 1959," §6082(a)(1)(A). Title III of the Act imposes liability on those who knowingly and intentionally traffic in such confiscated property. §§6023(13)(A)(i), (ii). The Act authorizes the President to "suspend" the Title III right of action, §§6085(c)(1), (2), and Presidents Clinton, Bush, and Obama continuously suspended the right of action from its effective date onward. President Trump allowed the suspension of the Title III right of action to expire in May 2019.

From 2016 to 2019, four commercial cruise lines—Royal Caribbean
Cruises, Norwegian Cruise Line Holdings, Carnival Corporation, and
MSC Cruises—transported nearly a million paid passengers to Cuba,
using the docks that Havana Docks built to embark and disembark
their passengers.  In 2019, Havana Docks invoked Title III and sued
the cruise lines in the United States District Court for the Southern
District of Florida.  The cruise lines argued they were not liable be-
cause Havana Docks' property interest would have expired in 2004
even absent confiscation.  The District Court rejected that argument
and entered summary judgment against all four cruise lines, awarding
Havana Docks more than $100 million from each.  A divided panel of
the Eleventh Circuit reversed.  In its view, a defendant is liable for
trafficking in confiscated property only if its actions would have inter-
fered with the plaintiff's property interest had there been no confisca-
tion.  On that view, because Havana Docks' concession would have ex-
pired before 2016, the cruise lines' challenged conduct from 2016 to
2019 did not constitute trafficking.

*Held*: The cruise lines' use of the docks is sufficient to establish that they
used "property which was confiscated by the Cuban Government"; Ha-
vana Docks is not required to establish that the cruise lines trafficked
in Havana Dock's property interest.  Pp. 8–16.

   (a) Title III generally makes any person who "traffics in property
which was confiscated by the Cuban Government . . . liable to any
United States national who owns the claim to such property."
§6082(a)(1)(A).  This dispute turns on whether the relevant "property
which was confiscated" must be Havana Docks' property interest in the
docks (the concession), or whether it could instead be the docks them-
selves.

   Under the plain text of Title III, "property which was confiscated"
can refer to the physical property in which the plaintiff had an interest,
and not just the interest itself.  Title III makes entities liable for traf-
ficking in "any property . . . and any . . . interest therein" that the Cu-
ban Government confiscated, §§6023(12)(A), 6082(a)(1)(A), and the
Act's definition of "property" makes clear that the Act imposes liability
for trafficking in both physical property and property interests.  The
term "any property" includes physical things, as the Court recognized
when it previously considered Fidel Castro's expropriations and noted
that the Cuban Government "nationalize[d] by forced expropriation
*property* . . . in which American nationals had an *interest*."  *Banco
Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 401 (emphasis added).

   The relevant "property which was confiscated" is therefore not lim-
ited to the plaintiff's interest in that property; it can refer to the phys-
ical property in which the plaintiff had an interest when the Cuban
Government "seiz[ed] . . . control of" it after January 1, 1959.

§6023(4)(A). Confiscated property is, as it were, tainted—off limits—such that anyone who uses the property can be liable to those who had any interest in the tainted property. Pp. 8–11.

   (b) On that understanding of "property," Havana Docks has shown that the cruise lines used confiscated property in which Havana Docks had a property interest and to which it owns a claim. The docks are "property which was confiscated" because Havana Docks established that the Cuban Government confiscated those docks without compensation when Castro's forces physically took possession of the docks and expelled Havana Docks' agents in 1960. The cruise lines "use[d]" or "engage[d] in commercial activity using" the docks, §§6023(13)(A)(i), (ii), when they transported nearly a million paying passengers to Cuba "without the authorization of" Havana Docks, §6023(13)(A). Finally, Havana Docks is a "United States national who owns the claim" to the confiscated docks, §6082(a)(1)(A), as its Commission-certified claim is "conclusive proof" that it has satisfied this element, §6083(a)(1). Pp. 11–13.

   (c) The Court of Appeals' analysis and the cruise lines' arguments conflict with Title III's text. Pp. 13–16.

      (1) The Court of Appeals interpreted the Act to require a counterfactual analysis, assuming that there had been no confiscation of the owner's property interest: "[T]he way to give effect to the statutory language ('traffics in property which was confiscated')," the court said, "is to view the property interest at issue in a Title III action as if there had been no expropriation and then determine whether the alleged conduct constituted trafficking in that interest." 119 F. 4th, at 1287. That counterfactual approach rested on the premise that "property" could refer only to present property interests, but this approach is difficult to understand and apply, and would foreclose liability in cases where the text demands it. If the approach requires courts to assume that the original rightsholder retained his legal rights, it would read out of the Act cases of trafficking that should be in the heartland of Title III, such as when companies sell and purchase confiscated property interests. Title III is instead simply an antitrafficking right of action that recognizes that the effect of the Cuban Government's expropriation was the destruction of the plaintiff's interest in the property. It then provides a right to compensation based on the plaintiff's *former* property interest from those who later traffic in the property and thereby help to support the Communist Cuban Government. Pp. 13–15.

      (2) The cruise lines' argument that the Cuban Government did not confiscate the docks, but only the concession, fails. The Act defines "confiscat[ion]" to include the seizure of "control of property," §6023(4)(A), and when armed agents physically occupied the dock

facilities, they seized control of the docks. Before the seizure, Havana Docks was in possession of the works; after the seizure, the Cuban Government stopped Havana Docks from operating, using, enjoying, possessing, or otherwise controlling the docks. The Cuban Government thereby extinguished Havana Docks' concession and physically occupied the docks, and those actions constitute confiscation of the docks under Title III. Pp. 15–16.

(d) Because the Court of Appeals wrongfully concluded that the cruise lines did not use confiscated property to which Havana Docks owns the claim, it did not reach the cruise lines' remaining arguments against liability; those arguments are not before the Court, and the Court does not address them. P. 16.

119 F. 4th 1276, vacated and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, SOTOMAYOR, GORSUCH, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. SOTOMAYOR, J., filed a concurring opinion, in which KAVANAUGH, J., joined. KAGAN, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 24–983

_____

## HAVANA DOCKS CORPORATION, PETITIONER *v.* ROYAL CARIBBEAN CRUISES, LTD., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[May 21, 2026]

JUSTICE THOMAS delivered the opinion of the Court.

In 1996, Congress enacted the Cuban Liberty and Democratic Solidarity Act. The Act seeks to deter trafficking in property that the Cuban Government confiscated from Americans after the Communist Revolution of 1959. 22 U. S. C. §§6081(3)(B), (11). To that end, the Act generally imposes liability on those who use confiscated property to which an American entity owns a claim. §§6082(a)(1)(A), 6023(13)(A)(i), (ii).

This case concerns whether the Act imposes liability on four cruise lines that used docks that the Cuban Government took from an American company in 1960. Before the Communist Revolution, petitioner Havana Docks Corporation built, operated, and held a time-limited property interest in docks at the Port of Havana. After the Communist Revolution, the Cuban Government seized control of those docks. Then, between 2016 and 2019, four commercial cruise lines used those same docks to embark and disembark nearly a million passengers. Havana Docks sued the cruise lines under the Act and won judgments against each of them in the District Court.

The Court of Appeals reversed. In its view, a defendant is liable for trafficking in confiscated property only if its actions would have interfered with the plaintiff's property interest had there been no confiscation. The court held that the cruise lines were not liable because Havana Docks' property interest in the docks would have expired before 2016 had the Cuban Government not confiscated the docks.

We disagree. The Act generally makes those who use property tainted by a past confiscation liable to any United States national who owns a claim to that property. Havana Docks did not have to prove that the cruise lines interfered with a property interest that would have existed in the counterfactual scenario in which the Cuban Government did not confiscate it. Instead, Havana Docks had to prove only that the cruise lines used confiscated property—such as the docks—to which Havana Docks owns a claim. We therefore vacate the Court of Appeals' decision.

I

A

In 1928, the United States-based Havana Docks Corporation acquired a property interest, specifically a "usufructuary concession," that allowed it to develop and operate dock facilities at the state-owned Port of Havana. A usufruct is a right to use, enjoy, or profit from another's property, 2 G. Cabanellas de las Cuevas & E. Hoague, Butterworths Spanish/English Legal Dictionary 659 (1991); F. Moore, The Cyclopedic Law Dictionary 1141 (3d ed. 1940), and a concession is a privilege granted by the government, Black's Law Dictionary 361 (rev. 4th ed. 1968). Relying on this usufructuary concession from the Cuban Government, Havana Docks completed a large terminal building and three piers—which we collectively refer to as the "docks"— at the Port of Havana.

Havana Docks acquired this property interest with certain conditions and guarantees. It enjoyed the right to operate and profit from the docks that it completed. Its property interest was time-limited and set to expire in 2004. Havana Docks therefore expected to control, operate, and profit from the docks for 76 years. At the end of the concession's term, the Cuban Government would "replace the concessionaire in possession of the works," and Havana Docks' "enjoyment of it and its proceeds" would come to an end. 1 App. 454–455. The Cuban Government agreed that, if it "expropriated" the docks before 2004, it "w[ould] compensate [Havana Docks] for the value of all works constructed by it." *Id.*, at 449.

The Communist Revolution cut Havana Docks' concession short without that compensation. After Fidel Castro seized power in 1959, he declared that "it is fundamental for the liberation and economic development of our country to liquidate the [American] commercial or industrial enterprises" operating in Cuba. *Id.*, at 483. To that end, the new Cuban Government decreed that it would forcibly take American "properties and enterprises located" in Cuba, targeting Havana Docks by name. *Id.*, at 483, 487. Under the decree, government forces seized the docks in 1960 and confiscated "all" of Havana Docks' "assets." *Id.*, at 497–498; see also *id.*, at 257. These assets included, as relevant here, the docks that Havana Docks had constructed and its property interest in those docks. All agree that this action prematurely destroyed Havana Docks' concession in 1960 and, by extension, its ability to benefit from the docks that it built. Brief for Respondents 21; 119 F. 4th 1276, 1286 (CA11 2024) (opinion below). The Cuban Government has never compensated Havana Docks for "the taking of its property," and it continues to operate parts of the docks to this day. *Id.*, at 1283.

Havana Docks filed a claim with the Foreign Claims Settlement Commission. Congress had authorized the Commission to determine "the amount and validity of claims . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of" "any property, right, or interest" by the Cuban Government. 22 U. S. C. §§1643a(3), 1643b(a). The Commission concluded that Havana Docks had "a concession for the construction and operation of" the docks and "real property with all improvements and appurtenances located" at the Port. 1 App. 256–257. It also confirmed that "the facilities of the company were physically occupied by agents of the Cuban Government" and that the Cuban Government had expropriated Havana Docks' assets. *Id*., at 257. It therefore certified about $9 million in losses, plus six percent annual interest. But, despite its certified losses, Havana Docks lacked any means to obtain compensation.

B

That began to change in 1996. On February 24 of that year, Cuban fighter jets shot down two unarmed American civilian airplanes over international waters. 61 Fed. Reg. 8843 (1996). In response, Congress promptly enacted the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, 22 U. S. C. §6021 *et seq*. Among other things, the Act codified the longstanding embargo against Cuba and set conditions for the normalization of relations between the two countries. §§6032(h), 6061, 6064, 6067(d).

As relevant here, the Act also sought to "deter trafficking in wrongfully confiscated property." §6081(11). Congress found that the Cuban Government had allowed foreign investors to use confiscated property to secure "badly needed financial benefit" for the regime, contrary to the American foreign policy goals of undermining the Castro regime and compensating United States nationals. §§6081(5), (6). Congress further found that the "international judicial system"

failed to provide "fully effective remedies . . . for unjust en-richment from the use of wrongfully confiscated property by . . . private entities." §6081(8). So, in Title III of the Act, Congress "endowed" American victims of confiscation "with a judicial remedy in the courts of the United States." §6081(11).

Under Title III, any entity that "traffics in property which was confiscated by the Cuban Government on or after Jan-uary 1, 1959, shall be liable to any United States national who owns the claim to such property." §§6023(11), 6082(a)(1)(A). Subject to certain exceptions, someone "'traf-fics' in confiscated property if" he "knowingly and inten-tionally" "sells," "purchases," or "uses" the confiscated prop-erty or "engages in a commercial activity using or otherwise benefiting from confiscated property" without authorization from the claimholder. §§6023(13)(A)(i), (ii). "Property" in-cludes "any property," including "real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." §6023(12)(A). And, "confiscated" refers to the "nationaliza-tion, expropriation, or other seizure by the Cuban Govern-ment of ownership or control of property" without compen-sation, settlement, or return of the property. §6023(4)(A). To prevail, then, a plaintiff must show that (1) the Cuban Government confiscated property on or after January 1, 1959; (2) the defendant trafficked in the property, such as by knowingly and intentionally using it without authoriza-tion; and (3) the plaintiff is a United States national who owns a claim to the property.[1]

---

[1] The definition of "traffics" in Title III includes several exceptions, in-cluding one for "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel." §6023(13)(B)(iii). These exceptions are not at issue before this Court. See n. 4, *infra*, at 12.

An entity that traffics in confiscated property is liable for
"money damages." §6082(a)(1)(A). Those damages are pre-
sumptively equal to the amount certified by the Commis-
sion if the plaintiff has a certified claim.
§§6082(a)(1)(A)(i)(I), (2). Title III trebles those damages "if
a United States national owns a claim with respect to that
property which was certified by the" Commission.
§6082(a)(3).

This right of action lay dormant for more than two dec-
ades. The Act authorizes the President to "suspend" the
Title III right of action based on a determination that the
suspension is in the national interest and will "expedite a
transition to democracy in Cuba." §§6085(c)(1), (2). Presi-
dents Clinton, Bush, and Obama continuously suspended
the right of action from its effective date onward. But, in
May of 2019, President Trump allowed the suspension to
expire, permitting the right of action to go into effect for the
first time. That policy change exposed traffickers in confis-
cated property of United States nationals to Title III liabil-
ity.

C

From 2016 to 2019, respondents—Royal Caribbean
Cruises, Norwegian Cruise Line Holdings, Carnival Corpo-
ration, and MSC Cruises—transported nearly a million
paid passengers to Cuba. These cruise lines paid entities
affiliated with the Cuban Government tens of millions of
dollars to do business in Cuba. They collectively earned
hundreds of millions of dollars in revenue from voyages that
included a stop in Havana. As part of this enterprise, their
cruise ships arrived at the docks that Havana Docks built,
where they embarked and disembarked their passengers.
They continued to do so even after receiving notice of Ha-
vana Docks' certified claim to the docks.

### D

Shortly after President Trump allowed the suspension of the right of action to expire in May 2019, Havana Docks filed lawsuits against these four cruise lines in the United States District Court for the Southern District of Florida. Havana Docks alleged that, between 2016 and 2019, the cruise lines had trafficked in confiscated property to which Havana Docks owned a claim.[2] The cruise lines did not dispute that they used the docks in question "without the authorization of" Havana Docks. §6023(13)(A). Instead, the cruise lines argued they are not liable because Havana Docks' property interest in those docks would have expired in 2004 even if there had been no confiscation, and the cruise lines "could not have trafficked in a time-limited concession that expired in 2004." *Havana Docks Corp.* v. *Carnival Corp.*, 592 F. Supp. 3d 1088, 1194 (2022).

The District Court rejected that argument, and, after rejecting other defenses not at issue here, entered summary judgment against all four cruise lines. *Id.*, at 1202–1203. Because the cruise lines had independently trafficked in the confiscated property, they were independently liable under Title III, and the District Court awarded Havana Docks more than $100 million from each of the cruise lines.

A divided panel of the United States Court of Appeals for the Eleventh Circuit reversed. It held that the cruise lines had not trafficked in confiscated property to which Havana Docks owned a claim. In its view, courts must "view the property interest at issue in a Title III action as if there had been no expropriation and then determine whether the alleged conduct constituted trafficking in that interest." 119

——————

[2] Havana Docks also alleged that Carnival had trafficked in its confiscated property from 1996 to 2001, but these allegations are not at issue here because the Court of Appeals did not address them and instead left them for the District Court to consider on remand. 119 F. 4th 1276, 1290 (CA11 2024).

F. 4th, at 1287.  Applying that test, it concluded that, because "any property interest that Havana Docks had by virtue of th[e] concession ended" in 2004, "the cruise lines' conduct from 2016 to 2019" would not have constituted trafficking if there had been no confiscation.  *Id.*, at 1288.  Its analysis assumed that Havana Docks had to establish trafficking in the time-limited property interest that had permitted it to build and operate the docks.

Judge Brasher dissented.  In his view, Havana Docks could establish liability based on the cruise lines' trafficking in the underlying physical property, "*the docks*—which still exist, are still in use, and have not expired, ended, or fallen into the sea*." Id.*, at 1294.  And, he explained, the "majority's counterfactual analysis—asking what would have happened to Havana Docks' docks if they had not been confiscated in 1960—is incompatible with the text of the Act." *Id.*, at 1291.  Instead, the analysis Title III requires here is "very simple": "The Cuban Government stole Havana Docks' property—its docks, piers, and other things that it had the right to operate under its concession." *Id.*, at 1292.  "And the cruise lines have—all agree—commercially benefited by depositing paying customers on those docks and piers."  *Ibid.*  So, "the cruise lines trafficked in confiscated property to which Havana Docks owns a claim."  *Ibid.*

We granted certiorari.  606 U. S. 1065 (2025).

                              II

Title III generally makes any person who "traffics in property which was confiscated by the Cuban Government . . . liable to any United States national who owns the claim to such property."  §6082(a)(1)(A).  The cruise lines argue that "[t]he Act demands a one-to-one correspondence between the property *interest* confiscated and the property *interest* trafficked."  Brief for Respondents 20 (emphasis added).  Havana Docks, meanwhile, argues that the Act im-

poses liability for trafficking in underlying physical property, not just interests in property. Reply Brief 1, 3–5. The dispute before us thus turns on whether the relevant "property which was confiscated" must be Havana Docks' property interest in the docks, or whether it could instead be the docks themselves. We hold that the cruise lines' use of the docks is sufficient to establish that they used "property which was confiscated by the Cuban Government." §6082(a)(1)(A). Havana Docks is not required to establish that the cruise lines used its property interest.

## A

Under the plain text of Title III, "property which was confiscated" can be the physical property in which the plaintiff had an interest, and not just the interest itself. Title III makes entities liable for trafficking in "any property . . . and any . . . interest therein" that the Cuban Government confiscated. §§6023(12)(A), 6082(a)(1)(A). The Act's definition of "property" thus makes clear that the Act imposes liability for trafficking in both the physical property and the property interests. Accord, *post*, at 4 (KAGAN, J., dissenting).

Ordinary meaning reinforces that conclusion. The term "any property," of course, includes physical things. "Any external thing over which the rights of possession, use, and enjoyment are exercised" can be "property." Black's Law Dictionary 1232 (7th ed. 1999) (Black's). Title III itself provides examples, including "real" property, §6023(12)(A), which includes "[l]and and anything . . . attached to" it, *id.*, at 1234, and "personal" property, §6023(12)(A), which includes movable things, *id.*, at 1233.

This Court has recognized that "property" ordinarily can refer to physical things in which people can have property interests. When this Court previously considered Castro's expropriations, it recognized that "property" can refer to both physical things and interests in them, noting that the Cuban Government "nationalize[d] by forced expropriation

*property* . . . in which American nationals had an *interest*." *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 401 (1964) (emphasis added). For that reason, the Cuban Government could, for example, expropriate "sugar itself" in addition to, or "rather than," "merely contractual rights" related to the sugar. *Id.*, at 413.

Construing "property which was confiscated" to refer only to the plaintiff's interest in the property would read out of the Act obvious ways in which people can traffic in confiscated property. One traffics, for example, by "us[ing]" confiscated property. §§6023(13)(A)(i), (ii). This form of "trafficking" ordinarily concerns things, not property interests: One uses land or other physical property, but one does not ordinarily use someone else's property interests. If, for example, your car is stolen and the thief lets another drive it, the other uses your car, but he does not use your property interest in your car. So, requiring "a one-to-one correspondence between the property *interest* confiscated and the property *interest* trafficked," Brief for Respondents 20 (emphasis added), would lead to the surprising result that entities could freely "us[e]" many kinds of confiscated property without exposure under Title III, contra, §§6023(13)(A)(i), (ii).

This case illustrates the point. The Court of Appeals agreed that, if the cruise lines had used the docks before Havana Docks' property interest was set to expire, they could have been liable under the Act. 119 F. 4th, at 1288, 1290. The dissent seems to agree. *Post*, at 3 (opinion of KAGAN, J.). Yet no matter when Havana Docks' property interest was set to expire, the cruise lines would not have "used" (or otherwise trafficked in) Havana Docks' *concession*. The cruise lines would have "used"—and trafficked in—"the docks" themselves. *Ibid.* But, the use of the docks would not be enough for liability on the Court of Appeals' and the dissent's view. See *post*, at 4 ("where the only 'property' confiscated from the plaintiff is an intangible property

interest, the defendant is liable only if he has trafficked in *that* interest").

We thus conclude that the relevant "property which was confiscated" is not limited to the plaintiff's interest in that property. "[P]roperty which was confiscated," §6082(a)(1)(A), can refer to the physical property in which the plaintiff had an interest when the Cuban Government "seiz[ed] . . . control of" it after January 1, 1959, §6023(4)(A). Knowingly and intentionally "traffic[king]" in that physical property by, for example, using it, can lead to liability under the Act. §§6023(13)(A)(i), 6082(a)(1)(A). In that way, confiscated property is, as it were, tainted—off limits—such that anyone who uses the property can be liable to those who had an interest in the tainted property.[3]

## B

On that understanding of "property," Havana Docks has shown that the cruise lines used confiscated property in which Havana Docks had a property interest and to which it owns a claim.

The docks are "property which was confiscated." §6082(a)(1)(A); 119 F. 4th, at 1294 (Brasher, J., dissenting). Havana Docks has established that the Cuban Government confiscated those docks without compensation. In 1960, the Castro regime expropriated American property, specifically targeting Havana Docks. 1 App. 483, 487. Then, Castro's forces physically took possession of the docks and expelled Havana Docks' agents. *Id.*, at 257. The Cuban Government therefore "seiz[ed] . . . control of" the docks, §6023(4)(A)— the physical property in which Havana Docks had an inter-

---

[3] This is not to say that property interests are irrelevant for Title III. A plaintiff can argue that the defendant trafficked in a confiscated property interest by, for example, purchasing, selling, or transferring the interest. See §6023(13)(A)(i).

est.  It follows that the docks are "property which was con-
fiscated by the Cuban Government" after January 1, 1959.
§6082(a)(1)(A).  See also *infra*, at 13–16.

The cruise lines "use[d]" or "engage[d] in commercial ac-
tivity using" the docks.  §§6023(13)(A)(i), (ii).  It is undis-
puted that when they transported nearly a million paying
passengers to Cuba, the cruise lines "used the docks."  Brief
for Respondents 23; see also Tr. of Oral Arg. 72 ("We have
used the docks").  It is likewise undisputed that they did so
"without    the    authorization    of"    Havana    Docks.
§6023(13)(A).  So, if the cruise lines did so knowingly and
intentionally, the cruise lines "traffic[ked] in property"—
the docks—"which was confiscated by the Cuban Govern-
ment."  §§6023(13)(A)(i), (ii), 6082(a)(1)(A).[4]

Finally, Havana Docks is a "United States national who
owns the claim" to the confiscated docks.[5]  §6082(a)(1)(A).
Although a plaintiff need not have a Commission-certified
claim, §6083(a)(2); Brief for Respondents 24, Havana Docks
has such a certified claim, which is "conclusive proof" that
Havana Docks has satisfied this element, §6083(a)(1).  The
Commission found that Havana Docks had acquired "a con-
cession for the construction and operation of" the docks and
"the real property with all improvements and appurte-
nances located" at the Port.  1 App. 256–257.  And, the Com-
mission found "that the facilities of [Havana Docks] were
physically occupied by agents of the Cuban Government"

———————

[4] The cruise lines have argued that their use of the docks fell within
the exception to Title III's definition of "traffics" for "uses of property in-
cident to lawful travel," §6023(13)(B)(iii), an argument that the District
Court rejected based on the general ban against travel to Cuba for tourist
activities, see 22 U. S. C. §7209(b)(1).  *Havana Docks Corp.* v. *Carnival
Corp.*, 592 F. Supp. 3d 1088, 1173–1174 (SD Fla. 2022).  The Court of
Appeals did not reach this issue because of its primary holding, and we
do not address it here.  119 F. 4th, at 1279, n. 1.

[5] The Court of Appeals rejected the cruise lines' argument that Havana
Docks is not a United States national within the meaning of the Act, see
*id.*, at 1281, a holding that is not before us here.

after the Cuban Government had nationalized Havana Docks' assets in 1960.  *Id.*, at 257.

\*     \*     \*

In sum, the Cuban Government seized control of "property"—the docks that Havana Docks built—in 1960.  At that point, the docks were tainted as confiscated property, the "the use of" which the United States sought to "deter." §§6081(8), (11).  The cruise lines later used the confiscated docks—property to which Havana Docks owns a certified claim—when they transported nearly a million passengers to Cuba between 2016 and 2019.  The Court of Appeals therefore erred in concluding that Havana Docks failed to establish these requirements for Title III liability.

### III

The Court of Appeals' analysis below, as well as the cruise lines' and dissent's arguments here, conflict with Title III's text.

### A

The Court of Appeals interpreted the Act to demand a counterfactual analysis.  "[T]he way to give effect to the statutory language ('traffics in property which was confiscated')," the court said, "is to view the property interest at issue in a Title III action as if there had been no expropriation and then determine whether the alleged conduct constituted trafficking in that interest."  119 F. 4th, at 1287.

This approach rested on the premise that "property" could refer only to present property interests.  But, no "Title III plaintiff" owns a present property interest "because that property now belongs to the Cuban Government."  *Id.*, at 1286.  After all, the Cuban Government expropriated those property interests in 1960.  See 1 App. 483.  In order to resolve this tension and "give effect" to its understanding of the statute, the Court of Appeals had to eliminate the "distorting effect of the confiscation" by assuming that there

had been no confiscation and then asking whether the defendant's use of the property would have interfered with the owner's property interest absent the confiscation. 119 F. 4th, at 1287–1288. In this case, the court posited a counterfactual scenario in which the Cuban Government "had never expropriated" Havana Docks' concession and then analyzed the defendants' conduct in that scenario. *Id.*, at 1288. Because the "concession expired in 2004" in this counterfactual scenario, and Havana Docks would have had to hand the docks over at that point anyway, the court reasoned that the cruise lines' conduct from 2016 to 2019 did not violate Havana Docks' rights and therefore cannot constitute trafficking under Title III. *Ibid.*

This counterfactual approach is difficult to understand and apply. If the approach requires courts to assume that the original rightsholder retained his legal rights, it would foreclose liability in cases where the text demands it. Suppose that an American owned land; the Cuban Government expropriated his property interest in the land; the Cuban Government transferred the property interest to a company; and the company sold it to another company. There should be no doubt that both companies are liable under Title III for "traffick[ing] in property which was confiscated" from an American, §6082(a)(1)(A): the first, by "sell[ing]" the property interest, and the second, by "purchas[ing]" it, §6023(13)(A)(i). But if, as the Court of Appeals suggested, we "treat" the property interest "as if the Cuban Government had never expropriated it," *id.*, at 1288, then the American would still own it, in which case the other companies could not have sold or purchased it. It makes little sense to "determine whether the alleged conduct constituted trafficking in that interest" because the alleged conduct—selling and purchasing—cannot occur in the counterfactual scenario. *Id.*, at 1287. We decline to adopt an approach that appears to read out of the Act cases of trafficking that should be in the heartland of Title III.

On the other hand, if all that the Court of Appeals meant is that the Act requires that the defendant traffic in the same property interest that the plaintiff held, then it still misunderstood the Act. In that case, the Court of Appeals' analysis simply rested on the assumption that the relevant confiscated and trafficked-in "property" must be the plaintiff's original property interest—here, the usufructuary concession. *Id.*, at 1287–1288. But, as Judge Brasher explained, "Havana Docks' theory is that the cruise lines are using *the docks*"—the physical property—not that they are using the property interest. *Id.*, at 1294. And, as we have explained, the Act allows Havana Docks to proceed on that theory. See *supra*, at 9–13. This understanding explains why a cruise line could have been liable under Title III for using the docks in 1997, 2001, or 2021, even though the cruise line would not have used Havana Docks' *interest* in the docks at any of those times.

Title III is simply an antitrafficking right of action. It recognizes that the effect of the Cuban Government's expropriation was the destruction of the plaintiff's interest in the property. See Black's 602 ("expropriation" is a "governmental taking or modification of an individual's property rights"); accord, 119 F. 4th, at 1286. It then provides a right to compensation based on the plaintiff's *former* property interest from those who later traffic in the property and thereby help to support the Communist Cuban Government.

B

The cruise lines make an additional argument for affirmance. Havana Docks' suit fails, the cruise lines contend, because "the Cuban government did not confiscate the docks"; it confiscated only the concession. Brief for Respondents 31. The dissent agrees. *Post*, at 4–5 (opinion of KAGAN, J.).

This assertion would have surprised anyone present in 1960 Havana. As explained, the Act defines "confiscat[ion]" to include the seizure of "ownership *or* control of property." §6023(4)(A) (emphasis added). When armed agents physically occupied the docks facilities, they seized control of the docks even if "Cuba owned the docks." *Post*, at 4 (opinion of KAGAN, J.). Before that seizure, the "concessionaire"—Havana Docks—was "in possession of the works." 1 App. 454; Brief for Respondents 32. After the seizure, the Cuban Government stopped Havana Docks from operating, using, enjoying, possessing, or otherwise "control[ling] the [docks]." *Id.*, at 23. The Cuban Government thereby extinguished Havana Docks' concession *and* "physically occupied" the docks, as the Commission found. 1 App. 257. Those actions constitute confiscation of the docks under Title III.[6]

IV

We conclude that the cruise lines used confiscated property to which Havana Docks owns the claim. Because the Court of Appeals concluded otherwise, it did not reach the cruise lines' remaining arguments against liability. Those arguments are not before us and we do not address them. Accordingly, we vacate the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.

*It is so ordered.*

––––––––––

[6] The dissent seemingly does not dispute that the Cuban Government seized control of the docks. See, *post*, at 4–5. After all, Havana Docks controlled the docks, then "armed officers" took them over. *Post*, at 4. Congress defined "confiscat[ion]" in the statute to include "seizure by the Cuban Government of . . . control of property." §6023(4)(A). "When a statute includes an explicit definition, we must follow that definition." *Tanzin* v. *Tanvir*, 592 U. S. 43, 47 (2020) (internal quotation marks omitted). Under the statutory definition, the dissent's theory has the surprising consequence that it is not "possible" for a landlord to prematurely seize control of "property it always owned" from a "renter with a lease." *Post*, at 2, 5.

# SUPREME COURT OF THE UNITED STATES

---

No. 24–983

---

## HAVANA DOCKS CORPORATION, PETITIONER *v.* ROYAL CARIBBEAN CRUISES, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[May 21, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAVANAUGH joins, concurring.

I agree with the Court's resolution of the narrow question before it and join the majority opinion in full. I write to highlight two issues that the Court does not reach but that raise significant concerns for remand or in other future Title III cases.

First, petitioner's reading of Title III, if adopted, could allow it to recover a potentially unlimited amount of money from an unlimited number of people who use the confiscated docks at issue. Here, the Foreign Claims Settlement Commission (Commission) certified that, in 1960, petitioner lost around $9 million from the confiscation of the docks. *Ante*, at 4. The District Court determined that, under Title III, each of the four cruise lines in this case was liable to petitioner for $110 million (after trebling the certified loss plus more than a half-century's worth of interest, and awarding additional legal fees and costs).

On petitioner's interpretation of Title III, however, those awards could be just the beginning. Title III specifies that "any person that . . . traffics in property which was confiscated by the Cuban Government . . . shall be liable" for no less than the value of the claim certified by the Commission, plus interest. 22 U. S. C. §6082(a)(1)(A)(i). Below, petitioner defended the District Court's awards by arguing, in

essence, that "any person" really means "each person," so
that each cruise line is liable for the full amount.

If petitioner is correct, then petitioner potentially could
recover $110 million from every person who uses the docks
in any way. Here, petitioner sued four cruise lines who used
the docks, but on its theory, nothing would prevent it from
recovering even more if other cruise lines had used the
docks in the past or if any cruise line uses them again in the
future. Nor would petitioner necessarily be limited to one
recovery against each cruise line. It could possibly seek to
recover the full $110 million against respondents for each
individual cruise; each docking, after all, was potentially an
independent instance of trafficking. See 28 U. S. C.
§1603(d) (defining "commercial activity" to mean "either a
regular course of commercial conduct or a particular com-
mercial transaction or act"); 22 U. S. C. §6023(3) (incorpo-
rating that definition); see also §6023(13)(A)(ii); but see
§6082(f)(1)(A) (appearing to limit plaintiffs to one suit per
"subject matter"). Liability could even theoretically extend
to third-party retailers aboard respondents' ships, mainte-
nance contractors at respondents' dockyards, and even the
nearly one million passengers who paid respondents to sail
to Cuba, all of whom arguably "engage[d] in a commercial
activity using or otherwise benefiting from" the confiscated
docks or "participate[d] in" respondents' commercial activi-
ties. §§6023(13)(A)(ii)–(iii). In short, this limitless reading
of the statute could permit petitioner to recover millions, if
not billions, of dollars over and over again, so long as any-
one continues to make any commercial use of the docks.

It is unlikely that Congress intended for someone who
suffered a finite loss to reap infinite recoveries. Congress
defined "confiscated" property to mean property that was
seized by the Cuban Government "without the property
having been returned or adequate and effective compensa-
tion provided." §6023(4)(A)(i). Congress also created the
Commission and tasked it with assessing the value of

claims stemming from the Cuban Government's confiscations and made the Commission-certified value a presumptive measure of a Title III plaintiff's recovery. *Ante*, at 4, 6; see §6082(a)(1)(A)(i). That statutory scheme suggests that Congress intended for the Commission's certification to supply a benchmark for adequate compensation; it does not expressly authorize repeatedly recovering the Commission-certified amount. Furthermore, if the statute is read the way petitioner suggests, then Title III's remedies could potentially violate the Due Process Clause to the extent that the statute imposes penalties against individual defendants that are "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I. M. & S. R. Co.* v. *Williams*, 251 U. S. 63, 66–67 (1919).

Second, there is a significant question as to whether respondents' conduct fell within a statutory exception to Title III liability for "transactions and uses of property incident to lawful travel to Cuba." §6023(13)(B)(iii); see *ante*, at 5, n. 1, 12, n. 4 (declining to address this exception). Indeed, the Federal Government appears to have previously taken the position that these cruises were lawful and beneficial to both Cuba and the United States.

For example, in 2016, President Obama announced at a joint press conference with Cuban President Raúl Castro that the United States Government had "removed the last major hurdle to resuming cruises and ferry service," which would "mean even more Americans visiting Cuba in the years ahead and appreciating the incredible history and culture of the Cuban people."* The Office of Foreign Assets Control (OFAC), which administers and enforces sanctions

———————

*Remarks by President Obama and President Raúl Castro of Cuba in a Joint Press Conference, The Obama White House (Mar. 21, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/03/21/remarks-president-obama-and-president-raul-castro-cuba-joint-press (archived at perma.cc/2JA3-NTP7).

by the United States against Cuba, also granted one respondent a license that specifically authorized "carrier services by vessel to, from, or within Cuba in connection with travel or transportation between the United States and Cuba." App. 570. OFAC later amended its regulations "to authorize persons subject to U. S. jurisdiction to provide carrier services by vessel, without the need for specific licenses." 80 Fed. Reg. 56916 (2015). Further, the State Department previously informed petitioner that it would not bring enforcement actions against respondents because of "the clear exclusion" from the definition of "'traffics'" that shields "transactions and uses of property incident to lawful travel to Cuba." App. 834.

To be sure, as petitioner argued below, at the same time the Government made these statements, it also warned respondents that their activities had to comply with any applicable regulations and could not exceed the scope of the licenses provided to them. See, *e.g.*, *id.*, at 570–572 (emphasizing additional restrictions on cruises); *id.*, at 869–875 (cautionary letter issued by OFAC). Even so, as the United States explained at argument, "[t]o the extent that Respondents received assurances from appropriate government officials that what they were doing was lawful and authorized," holding them liable for that conduct could "raise due process concerns." Tr. of Oral Arg. 57–58.

As neither the infinite-recovery issue nor the lawful-travel issue was fairly included within the question presented, the Court appropriately does not address either one here. See this Court's Rule 14.1(a). The Court also correctly expresses no view as to other issues unaddressed by the Eleventh Circuit, such as respondents' argument that petitioner's concession was nonexclusive and limited to cargo services, Brief for Respondents 34, and respondents' argument that the Commission's certification violates due process or the Seventh Amendment, *id.*, at 40–42. To the extent any of these or other issues remain and are properly

SOTOMAYOR, J., concurring

preserved, the Eleventh Circuit should address them in the first instance on remand.

# SUPREME COURT OF THE UNITED STATES

No. 24–983

## HAVANA DOCKS CORPORATION, PETITIONER *v.* ROYAL CARIBBEAN CRUISES, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[May 21, 2026]

JUSTICE KAGAN, dissenting.

Today the Court misconstrues the Cuban Liberty and Democratic Solidarity Act to allow plaintiffs to recover for trafficking in property that was not theirs. Title III of that Act provides that "any person" that "traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property." 22 U. S. C. §6082(a)(1)(A). The majority holds that because four commercial cruise lines used docks in the Port of Havana between 2016 and 2019, they can be held liable to Havana Docks Corporation, a U. S. company that built, operated, and once held a property interest in those docks. That may seem sensible at first blush. But there is a problem: The docks are not "property which was confiscated by the Cuban Government" within the meaning of Title III. Why? Because the docks belonged to the Cuban Government—not Havana Docks—all along. What Havana Docks owned was only a property interest allowing it to use those docks for a specified time. And that time-limited interest expired in 2004—more than a decade before the cruise lines ever used the docks.

The key to getting this case right is understanding the nature of the property interest that Havana Docks once held in the docks. In 1905, the Cuban Government granted

Compañia del Puerto a 50-year "usufructuary concession" so that it could build and then operate docks at the Port of Havana. See 119 F. 4th 1276, 1278, 1281 (CA11 2024). As the majority explains, a "usufruct" is a "right to use, enjoy, or profit from another's property" (here, Cuba's property in the Port), and a "concession" is a "privilege granted by the government" (here, the Cuban Government). *Ante*, at 2. So the deal struck was this: Compañia del Puerto would build docks for Cuba at the Port and, in exchange, Cuba would let the company operate those docks for a limited time. Later, that usufructuary concession was assigned to Havana Docks and extended to 99 years, meaning that it would expire in 2004. So Havana Docks' property interest in the docks, like its predecessor's, was a time-limited one. Before 2004, Havana Docks had a right to make use of the docks, even though they belonged to Cuba; after 2004, the company had no right to anything. You might think of Havana Docks as a renter with a lease set to expire in 2004.

Everyone agrees that Havana Docks did not get all it was promised. That is because in 1960, 44 years before the concession was to expire, Cuba issued a decree nationalizing Havana Docks' assets and sent armed agents to physically occupy the docks. Those actions "prematurely destroyed Havana Docks' concession" and, "by extension, its ability to benefit from the docks." *Ante*, at 3. The Foreign Claims Settlement Commission confirmed as much, finding that Cuba had seized from Havana Docks a concession for the "operation of wharves and warehouses in the harbor of Havana," which was "to expire in the year 2004," as well as associated "equipment, furniture and fixtures." App. to Pet. for Cert. 138a, 141a. The Commission thus certified about $9 million in losses, plus six percent annual interest. Cuba has never compensated Havana Docks for that harm.

But the question in this case is not whether Cuba should pay Havana Docks for depriving it of 44 years of its concession; the question is instead whether cruise lines using the

docks twelve years after the concession's expiration date are liable to Havana Docks under Title III. And the answer to that question is no. Recall what the statute says: "[A]ny person" that "traffics in *property which was confiscated* by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property." §6082(a)(1)(A) (emphasis added). The "property which was confiscated" from Havana Docks is a time-limited concession. We know that is the "property which was confiscated" because that is the only property Havana Docks ever owned—and thus the only property Cuba could have confiscated from it. So to hold the cruise lines liable, Havana Docks must show that they "traffic[ked] in" its time-limited concession. Had the cruise lines used the docks before 2004, Havana Docks would have a good argument that they did so. But the cruise lines did not use the docks until 2016—years after Havana Docks' concession was scheduled to expire. Given that fact, the cruise lines did not "traffic in" the "property which was confiscated" from Havana Docks and so are not liable to it under Title III.

The Court reaches the opposite conclusion because it believes that the "property which was confiscated" in this case includes the physical docks themselves. See *ante*, at 11. The majority believes that not because it thinks the physical docks ever belonged to Havana Docks. On the contrary, the majority acknowledges that Havana Docks' sole "property interest was time-limited and set to expire in 2004." *Ante*, at 3. But as the majority sees it, when Title III says "property which was confiscated," it means not just the property interest that was actually confiscated from the plaintiff (here, the time-limited concession), but also "the physical property in which the plaintiff had an interest" (here, the physical docks). *Ante*, at 9, 10–11. There are three related problems with that theory of the case.

First, it misreads the statute Congress wrote. Congress could have imposed liability on "any person" that "traffics in property *in which a United States national held an interest* which was confiscated." If so, the majority's result would follow. But that is not what Title III says. Instead, the statute imposes liability on "any person" that "traffics in property which was confiscated," period. §6082(a)(1)(A). So, where the only "property" confiscated from the plaintiff is an intangible property interest, the defendant is liable only if he has trafficked in *that* interest. Trafficking in the underlying physical thing is not enough, because doing so is not trafficking in the "property which was confiscated." Of course, the majority is right that, by defining "property" to include both physical things and intangible interests, the Act "makes clear" that liability can be imposed for trafficking in either. *Ante*, at 9; see §6023(12)(A) ("The term 'property' means any property . . . , whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest"). But that fact does not help the majority's cause. It means that where the "property" confiscated from the plaintiff is a physical thing, liability can attach for trafficking in that thing. It does not mean (as the majority seems to think) that where the "property" confiscated from the plaintiff is an intangible interest, liability can attach for trafficking in something other than that interest—that is, in the underlying physical thing. Always, according to the statute, trafficking can give rise to liability only when it is in the actual "property which was confiscated."

Second, the docks are not "property which was confiscated by the Cuban Government" because they were not, in fact, confiscated by the Cuban Government; rather, Cuba owned the docks all along. True enough that in 1960, the Cuban Government issued a decree expropriating Havana Docks' assets and sent armed officers to physically occupy the docks. That is how Cuba confiscated Havana Docks'

usufructuary concession.  But in taking those measures, Cuba did not somehow confiscate *the docks*, because the docks already belonged to Cuba.  The majority emphasizes that the Act defines "confiscat[ion]" to include seizing "control of property" and argues that Cuba's actions fit that description because Cuba seized "control" of the docks.  See *ante*, at 15–16.  But nothing in the Act's definition—more fully stated, "the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959," §6023(4)(A)— makes it possible for Cuba to confiscate property it always owned (and Havana Docks never did).  The definition's inclusion of seizure of "control" just means that Cuba can "confiscate[]" property belonging to someone else by seizing "control" of it, even if ownership does not change hands.  So, for example, if Havana Docks had owned the docks and Cuba had taken "control" of them without obtaining title, that would still have counted as "confiscat[ion]."  But that is not what happened here—because, again, Havana Docks owned not the docks themselves, but only a time-limited interest in using them.*

Finally, the majority's approach ignores basic principles of property law.  As every first-year law student learns, "property" is defined by reference not just to spatial boundaries, but also to temporal ones.  Cf. *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 331–332 (2002) ("An interest in real property is defined by the metes and bounds that describe its

---

*The majority is wrong to say that this view "has the surprising consequence that it is not 'possible' for a landlord to prematurely seize control of 'property it always owned' from a 'renter with a lease.'" *Ante*, at 16, n. 6.  A landlord could of course prematurely take control of physical property (say, a house) that he owns but is leasing to a renter.  It is just that, when the landlord does so, what he confiscates is not the house— which he already owns—but the lease alone, with its scheduled expiration date.

geographic dimensions and the term of years that describes
the temporal aspect of the owner's interest. . . . Both dimen-
sions must be considered if the interest is to be viewed in
its entirety"). Yet the majority inexplicably privileges the
spatial. It is obvious that a plaintiff cannot recover under
Title III for trafficking in property that falls outside its own
property's spatial boundaries. Suppose Havana Docks had
a concession of unlimited duration, but only in the red
dock—not in the blue dock next to it. Havana Docks could
then recover from a defendant who uses the red dock, but
not from a defendant who uses the blue dock because that
dock lies outside its property interest. And if that is so, why
should it be different when the boundary is temporal, ra-
ther than spatial? Havana Docks had a concession in the
docks until 2004, so it could get compensation from a de-
fendant who used the docks before that date. But just as
Havana Docks could not recover from the user of the blue
dock, so too it should not recover from someone who used
the docks after 2004, when its concession was due to expire.
In either case, the trafficking would be in a thing falling
outside Havana Docks' property interest—and whether it
falls outside the interest's spatial boundaries, or instead its
temporal ones, should make no difference to the outcome.

At the end of the day, the Court's interpretation of Title
III treats all property interests as if they were perpetual
ones. Like the Eleventh Circuit, I "do not believe that Con-
gress, in enacting Title III, meant to convert property inter-
ests which were temporally limited at the time of their con-
fiscation into fee simple interests in perpetuity such that
the holders of such limited interests could assert trafficking
claims through what Buzz Lightyear called 'infinity and be-
yond.'" 119 F. 4th, at 1287 (quoting Toy Story (Pixar Ani-
mation Studios/Walt Disney Pictures 1995)). Instead, I
would hold that a plaintiff can recover under Title III only
when the defendant traffics in the actual property that was
confiscated from the plaintiff. Here, that means Havana

KAGAN, J., dissenting

Docks' claim should fail, because the cruise lines did not traffic in Havana Docks' time-limited—and long-ago expired—concession.  I respectfully dissent.